## THE STATE v. JOHN B. MILES, Appellant.

### Division Two, December 4, 1906.

1. **JUROR: Opinion Formed From Rumor.** Where a juror had not talked to any witness in the case and the opinion he had formed and expressed was based on neighborhood rumors, he was not qualified.

2. **———: Challenge.** A challenge of a juror "for cause" and nothing more, states no ground for the challenge, and does not draw in question the competency of the juror.

3. **IMPEACHMENT OF WITNESS: Confined in Jail.** Contempt of court for failing to obey a subpoena of court to appear as a witness is in no sense a criminal offense, and proof that the witness had been in jail for the contempt does not tend to impeach him as a witness. Such evidence relates to an immaterial matter, and should not be brought into the case, and if admitted cannot be said to prejudice the rights of defendant.

4. **EVIDENCE: Out of Order.** It is not error to permit the State, after the close of all the other evidence, to offer evidence that was clearly competent in chief—in this case, a trunk showing the bullet holes made by shots from defendant's pistol as he was firing at deceased.

State v. Miles.

5. **WITNESS: Relationship to Defendant.** It is not improper to permit the State to show on cross-examination that a witness for defendant is a suitor of the defendant's daughter.

6. **INSTRUCTION: Omitting Words Feloniously and Beyond Reasonable Doubt.** It is not error to omit the word "feloniously" altogether from the instructions. Neither is it error to omit the words "beyond reasonable doubt" from an instruction defining murder in the second degree, in all other respects free from objection, if those words are contained in a general instruction applicable to the testimony as a whole.

7. **REMARKS OF PROSECUTING ATTORNEY: In Opening Statement.** The prosecuting attorney in his opening statement to the jury said: "We shall show you that a more dastardly murder was never perpetrated upon a noble and Christian soul." Objection being made by defendant's counsel, the court said the language was improper and said to the prosecuting attorney that he had already intimated to him that he should confine his remarks to what he expected to prove. *Held,* not to be reversible error.

8. **———: ———: Not Preserved in Motion for New Trial.** If defendant wishes to have remarks of the prosecuting attorney made in his opening statement reviewed by the appellate court, he must call the attention of the trial court thereto in his motion for new trial.

9. **INSTRUCTION: During Course of Argument: Marshal's Right to Carry Pistol.** Defendant, a town marshal, had gone into the country to settle a personal difficulty with deceased, and there killed him. In his argument to the jury, his counsel said that defendant, as marshal of the town, had a right to have and carry concealed on his person a pistol, and thereupon the court, during said counsel's argument, gave an instruction in writing to the jury to the effect that the fact that defendant at the time was a town marshal would not authorize him as such officer to go around the country armed with a pistol. *Held,* that the right of defendant to carry concealed weapons was not an issue in the case, and any reference to such right was foreign to a proper discussion thereof, and the action of the court in trying, by this method, to correct the harm such statement might have done, was not prejudical to defendant.

10. **REMARKS OF COUNSEL: Defendant as Witness.** It is not an improper argument for the prosecuting attorney, in attempting to show that there was no contradiction of the witnesses upon a material point, to repeat what defendant and other witnesses had testified in regard thereto.

11. ———: ———: **Deductions from Evidence.** The prosecuting attorney stated defendant "put his hand into his bosom and pulled out a naked pistol. The defendant did not deny it; there is no contradiction of that fact." The defendant had testified that he shot at deceased three times as he ran from him. *Held,* that the remarks, under the circumstances, were entirely authorized.

12. ———: **Referring to Character of Witnesses.** It is no reversible error for an attorney for the State to refer to one of its witnesses as a good man, nor to a witness for the defendant whose testimony has laid him open to the severest criticism, as "a black rascal, whose testimony should not control the judgment of the jury."

13. **VERDICT: Illegal: Refusing to Receive: Correction.** It is the duty of the court to refuse to receive a verdict which is illegal on its face or contrary to law, and it is also the right of the jury, when by a reading of their verdict by the clerk they discover that it contains a mistake, to correct it.

14. ———: ———: ———: ———: **Verdict of Manslaughter: Imprisonment for Thirty Years.** The jury returned a verdict finding defendant guilty of manslaughter and assessing his punishment at imprisonment in the penitentiary for thirty years. When it was read by the clerk, the court announced that it was not in accordance with the instructions, and some of the jurors stated that there was a mistake, that it was not their verdict. Thereupon, the court directed them to retire and consider of their verdict. *They did so and afterwards returned a verdict finding defendant guilty of murder in the second degree and assessing his punishment at thirty years' imprisonment. Held,* that the court did not receive the first verdict, that it properly refused to accept it, and pursued the proper course to have it corrected.

15. ———: ———: **Acceptance: Statute: Applicability.** The statute (sec. 2651, R. S. 1899), providing that "if the jury assess a punishment, whether of imprisonment or fine, greater than the highest limit declared by law for the offense of which they convicted the defendant, the court shall disregard the excess, and pronounce sentence and render judgment according to the highest limit prescribed by law in the particular case," refers to a case in which the court accepts the verdict; but it does not require the court to accept an illegal verdict, such as one finding defendant guilty of manslaughter and assessing his punishment at imprisonment for thirty years, nor require the court to receive a verdict which the jury, when their attention is called to it, state is not their verdict.

State v. Miles.

16. ———: **Erroneous: No Exception at the Time.** Unless an objection is made and exception taken at the time to the action of the court in calling the attention of the jury to an error in their verdict and in permitting them to retire to their room and correct the same, the court's action is not reviewable on appeal. That error, as all others, cannot be urged for the first time in the motion for a new trial.

17. **INSTRUCTIONS: Oral Explanation: No Exception.** Unless the appellant at the time the jury were brought in and the court explained to them orally the meaning of the instructions in reference to punishment, objected and took an exception, the court's action is not reviewable on appeal.

18. **IMPROPER QUESTIONS: Objection Sustained.** It is too plain for argument that the trial court cannot be convicted of error because the prosecuting attorney asked certain witnesses as to the good reputation of certain of the State's witnesses when their reputation had not been attacked, if the court, when objection was made to such questions, sustained the objections.

19. **VERDICT: Passion and Prejudice.** The testimony of the State's witnesses was that defendant began the difficulty by striking deceased over the head with his pistol when the deceased was unarmed, and then as deceased ran from him shot him three times. It also justified a finding that defendant went to the premises of deceased armed with a pistol, and without any lawful provocation assaulted him. *Held*, that the punishment of imprisonment in the penitentiary for thirty years is not so excessive as to indicate bias and prejudice on the part of the jury.

Appeal from Pemiscot Circuit Court.—*Hon. Henry C. Riley*, Judge.

AFFIRMED.

*Faris & Oliver* and *R. L. Ward* for appellant.

(1) The court erred in refusing the challenge for cause of William Kinley. If Kinley had an opinion, what difference can it make from whence that opinion was derived? State v. Bauerle, 145 Mo. 15; U. S. v. McHenry, 6 Blatch. 503; U. S. v. Hanway, 2 Wall. 143; U. S. v. Woods, 4 Cranch C. C. 484; Coughlin v. People, 19 L. R. A. 57; Rothschild v. State, 7 Tex. App.

519; People v. Reyes, 5 Cal. 347; Ins. Co. v. Schueller, 60 Ill. 465; Plummer v. People, 74 Ill. 361; Owens v. State, 32 Neb. 167; Greenfield v. People, 74 N. Y. 277; Dugle v. State, 100 Ind. 259; Polk v. State, 45 Ark. 165; Wright v. Com., 32 Gratt. 941. (2) The court erred in permitting the State to show that one Robert Barksdale, a witness for defendant, had been confined in jail on the night preceding the day on which he testified, and in allowing the State to show by said Barksdale on cross-examination that he had been so confined. Said witness had not been in jail charged with any criminal offense, nor as a punishment following conviction for any felony or misdemeanor, but for a technical contempt, in that he had failed to answer when called as a witness. Such manner of impeachment and cross-examination was unfair, prejudicial, and against the law. State v. Douglas, 81 Mo. 231; State v. Rockett, 87 Mo. 666; sec. 4680, R. S. 1899; Greenleaf on Evidence, sec. 373; 1 Wigmore on Evidence, sec. 520. It was error to permit the State, after the close of the State's case as well as after the close of that of the defendant, to offer in evidence the trunk in which bullet holes appeared, and to offer the testimony of Mrs. Kirkpatrick touching the same. Mrs. Kirkpatrick had been on the stand as a witness and the trunk had been in the custody of the State during the whole time of the trial. No reason whatever was shown why this testimony was not offered in chief. State v. Weber, 156 Mo. 249; State v. Holfield, 72 Mo. 518; State v. Shroyer, 104 Mo. 447; Williams v. State, 60 Ga. 367. It is insisted that the court not only erred in allowing testimony in identification of the trunk to be offered out of time, but that it was error to allow this trunk to be offered in evidence, and paraded before the jury, at all. It could serve no useful purpose, nor any purpose except to inflame the minds of the jury, and prejudice them against the defendant. Moore v. U. S., 150 U. S. 57. It was error for the court to permit the State to

cross-question witness Luther Frankum, who testified for the defendant, as to his feelings for the daughter of the defendant. While there is almost no limit to which the State might not have gone in its questions as to bias in favor of the defendant himself, it is insisted that such inquiry can not be directed toward witness's feelings for members of defendant's family. State v. Montgomery, 28 Mo. 594; State v. Glynn, 51 Vt. 577. (3) Instruction 2, being the instruction by which the court undertook to define murder of the second degree, was erroneous, in that it should have contained the word "feloniously" and have required the jury to find the elements going to make up the offense of murder of the second degree "beyond a reasonable doubt." It did neither. State v. Bauerle, 145 Mo. 18; State v. Hyland, 144 Mo. 302. (4) The court erred in permitting counsel for the State to use improper language and to make improper remarks, both in the opening statement to the jury and in their closing argument. (a) It was error for counsel for the State to say to the jury, in his opening statement, that "the State would show that deceased was known to the merchants of this town and to the officers here, as one of the best men in this county," and upon being informed by the court that such discussion was improper, to accentuate his audacious impropriety by saying, "If it is improper to tell the jury what kind of man he is, I will withdraw the statement." During the whole trial no attack was made upon the character or reputation of the deceased. If it is fundamental law that the good reputation of the deceased may not be shown by the State until such reputation has been attacked by the defendant, may it not be said to be equally basic that the State shall not by her prosecuting officer lay vaunting claims to the possession of proof, the admission of testimony concerning which, would almost have outraged decency? 1 Wigmore on Evidence, sec. 63, note; Dukes v. State, 11 Ind. 557; Fields v. State, 134 Ind. 46; State v. Shipley, 174 Mo.

516. (b) It was error, the more prejudicial and hurt-
ful to the defendant in that it occurred in the opening
statement of the prosecuting attorney, for the court to
permit such attorney to say of his own witnesses:
"Kelley Summers is a good old man, and Mrs. Hearn
is a good old woman." State v. Thomas, 78 Mo. 327;
State v. Grant, 79 Mo. 133; State v. Cooper, 71 Mo. 436.
For this flagrant departure from the ethics which
should guide the feet and dominate the conduct of a
prosecuting attorney, the court failed to rebuke coun-
sel as was requested by the defendant, but told him to
discuss these matters later; thus, by implication, in-
forming the jury that such later discussion would be
proper; when as a fact in this case the reputations of
the State's witnesses, for lack of attack thereon by the
defendant, never became a proper matter of either in-
quiry or discussion on the part of the State. State v.
Shipley, 174 Mo. 516. (c) However, after being thus
advised by the court that such discussion was, to say
the least, untimely, the prosecuting attorney did not
stop, but in a sense, added outrage to error, by using
instantly thereupon this language: "I am just tell-
ing the jury what I expect to show, so that if I am lying
about it they can show it to the jury." That a party
may not attempt to "bolster up," or rehabilitate the
reputation of his witnesses until after an attack has
been made upon the reputation of such witnesses, is a
principle of law universally accepted. 2 Wigmore on
Evidence, sec. 1104, note. (d) Again, in his opening
statement, the prosecuting attorney used this language:
"This is one of the most hellish, tortious and brutal
murders, ever perpetrated on a noble, Christian soul."
As it is just as much a crime to kill a bad man, without
justification, as it is to kill a good man, it is never com-
petent, except in rebuttal after an attack by the defense
upon the character and reputation of the deceased, for
the State to prove such reputation. If the State could
not prove it, *a fortiori*, the State could not talk about

it before the jury.   This statement was error greatly prejudicial to defendant.   Even if the court had checked and properly rebuked the prosecuting attorney, which it did not, it is insisted that such remarks of the prosecuting attorney would not have had the virus drawn from them by a rebuke from the court.   State v. Young, 99 Mo. 666; State v. Furgeson, 152 Mo. 92; State v. Shipley, 174 Mo. 512; State v. Guinn, 174 Mo. 680; State v. Kring, 174 Mo. 647; State v. Brownfield, 15 Mo. App. 593.   (5)   The court erred in refusing to retain and record the first verdict of the jury.   Sec. 2651, R. S. 1899; State v. Robb, 90 Mo. 34; State v. Dennison, 108 Mo. 543; State v. Foster, 115 Mo. 481.

*Herbert S. Hadley*, Attorney-General, and *N. T. Gentry*, Assistant Attorney-General, for the State.

(1)   No error was committed by the trial court in allowing the State to ask the witness, Robert Barksdale, where he had spent the previous night, and in compelling said witness to answer that question.   The only objection made by defendant to said evidence was that it was "irrelevant, immaterial and incompetent," which this court has said amounts to no objection at all.   State v. McLaughlin, 149 Mo. 27; State v. Young, 153 Mo. 449.   But even if said objection had been full and the exceptions properly saved, no possible harm could have resulted to defendant, especially in view of the additional questions propounded to said witness by defendant's counsel.   The State clearly had a right to cross-examine said witness, to bring out from him anything that would tend to weaken his evidence, to show his interest or bias, as well as to reflect on his credit and standing.   And, in the re-examination of said witness, defendant had a right to have him explain anything which the State brought out that tended to reflect on his character.   This was done by defendant, and he thereby vindicated his witness, and the error, if

error had been committed, became nonprejudicial. The fact that the witness had been convicted and sent to jail for contempt of court, could, in no possible way, have biased the jury against him, nor reflected upon his credibility. Neither did the trial court commit error in allowing the State to examine Mrs. Jessie Kirkpatrick in rebuttal, and to prove by her the fact that she found two bullet holes in deceased's trunk. While said evidence may have very properly been introduced in chief, yet it was also competent in rebuttal. State v. Reed, 137 Mo. 134; State v. Linney, 52 Mo. 41; 1 Thompson on Trials, sec. 344; State v. Goddard, 162 Mo. 229; State v. Thornhill, 177 Mo. 696. If it was competent to contradict the defendant by oral evidence, certainly it was competent to contradict him by introducing in evidence the trunk that had bullet holes in it. The record does not show that the trunk was "paraded before the jury" any more than any other piece of evidence. And its introduction could not have "inflamed the minds of the jury and prejudiced them against the defendant" any more than the introduction in evidence of a coat or a shirt worn by the deceased, nor the introduction of a bloody knife or a powder-stained pistol, with which the homicide had been committed; all of which have been held to be proper evidence in murder cases. 4 Elliott on Evidence, sec. 3028; 2 Wigmore on Evidence, sec. 1157; Underhill on Crim. Evid., sec. 48; State v. Goddard, 146 Mo. 184; State v. Wieners, 66 Mo. 29; Wharton on Homicide (2 Ed.), sec. 674; Hart v. State, 15 Tex. App. 230. (2) No error was committed by the trial court in giving instruction 2 for the State; in fact, said instruction has been approved by this court, when the words "beyond a reasonable doubt" were added thereto. State v. Bauerle, 145 Mo. 18. And it has often been held that it is not necessary to add said words to every instruction, when another instruction is given defining reasonable doubt. State v. Pyscher, 179 Mo. 156; State v. Hyland, 144 Mo. 311; State v. Parker, 172

Mo. 205; State v. Marsh, 171 Mo. 528.   (3) (a) Even
if it be admitted that error was committed by the prose-
cuting attorney in his opening statement, when he re-
ferred to the good character of the deceased, defend-
ant's counsel have failed to preserve said error for re-
view.   (b) The same is true of the remark of the prose-
cuting attorney to the effect that Kelley Summers and
Mrs. Hearn, two of the State's witnesses, were good
people.   As this part of the opening statement is not
assigned as error in defendant's motion for a new trial,
the same is not subject to review by this court.   (4)
No verbal instructions were given by the trial court at
the time of receiving the verdict, nor prior thereto. It
is true, that the jury returned a verdict which the court
could not receive, and did not receive.   The jury were
sent back to their room to correct the verdict, which was
promptly done.   But, if technicalities are to be indulged
in, defendant has waived his right to object to the re-
marks of the trial court by failing to object and failing
to save his exceptions to said remarks at the time they
were made.   The record shows that defendant was pres-
ent, in person and by his attorney, and yet made no ob-
jections to the remarks of the court.   The first mention
of any objections from defendant is in the motion for
a new trial; this is not sufficient. State v. DeWitt, 152
Mo. 86; State v. DeMosse, 98 Mo. 343; State v. McCar-
ver, 194 Mo. 733.   (5) No error was committed by the
trial court in refusing to receive and enter up the first
verdict returned by the jury. State v. DeWitt, 186 Mo.
71.   (6) The evidence was sufficient to warrant a con-
viction of the defendant, even of murder in the first de-
gree.

GANTT, J.—On the 9th day of December, 1904,
the prosecuting attorney of Pemiscot county filed an in-
formation charging the defendant and one Luther
Frankum with murder in the first degree.   At the July
term, 1905, the case was dismissed as to Frankum and

the defendant was tried and convicted of murder in the second degree, and his punishment assessed at thirty years in the penitentiary. After taking the proper steps he appealed the cause to this court.

The evidence on behalf of the State tended to prove that the deceased, George Bradley, and his wife and three small children lived as a tenant in a house on a farm owned by the defendant, Miles, which farm was situated some two or three miles from the town of Game or Stubtown in Pemiscot county. At the time of the homicide defendant was marshal of the said town and had been for two years. The wife of the deceased had been away from home for a few days visiting at her mother's and had taken with her a sewing machine, trunk and bed. Early on the morning of December 7th, Bradley, the deceased, drove his wagon to his mother-in-law's, and brought his wife and children and the said furniture back to his home, on defendant's farm. When he reached home, he left his team at the gate and moved the trunk and machine to the porch of the house, and then went in the front room to kindle a fire. The house consisted of two front rooms with a hall between them, and the porch in front of the hall and the two rooms. The deceased, it seems, was cropping on shares for the defendant, and had raised a crop of potatoes and had cut some wood, and the defendant had moved some of these potatoes and put the others in the ground and covered them up. Early on the morning of the difficulty, Frankum, who was in the employ of the defendant and doing some work on this farm, said to one Summers, in the presence of the defendant, that Bradley had said the day before that defendant was taking too much authority down there at the farm, and that he, Bradley, would rather defendant would not do the like any more. To this the defendant replied, "Well, when I get down there, me and Bradley will have a settlement; you see if we don't." This was said in an angry tone. Soon after breakfast, the defendant

and Frankum and Felix Noble got into a road wagon, and drove from Game to the defendant's farm, where the deceased was living. The defendant took his pistol along with him. When they reached the farm, they stopped the wagon near the lot gate and the defendant and Noble got out of the wagon and walked to the yard gate. While the deceased was trying to make the fire in the front room, the defendant called to the deceased's wife, who was on the front porch, to tell deceased to come out there, that he wanted to settle. After being told of this message, the deceased got his account book and walked out towards the front gate, which was about twenty-seven feet distant from the house. As the deceased walked along he opened the account book and was looking at it and was turning the leaves; when he got near to the gate, defendant said to him, "George, you have been blowing too much," and the evidence on the part of the State tends to show that the defendant at once drew his pistol and began striking the deceased on the head and face, and then fired at the deceased twice. The first shot took effect in the left wrist of the deceased, and the second in the left side, coming out at the back. The deceased ran towards his wife, who was standing on the front porch, and there was evidence that as he ran the defendant fired three more shots at him, one of which took effect in the back just under the left shoulder blade and came out over the left collar bone, the bullet ranging upward. Two of the shots fired by the defendant struck the trunk on the front porch. As the deceased ran by his wife he stumbled, but regaining his balance ran into the house, got his gun, returned to the front porch and fired at the defendant, who was then retreating down the road. Deceased soon became weak and fell to the ground. He was carried into the house by his wife and Mr. Jones and expired in about thirty or forty minutes.

The foregoing facts were testified to by Mrs. Brad-

ley, and she was corroborated by Felix Noble and Mrs. Martha Hearn.

The State's witnesses also testified that the deceased was inside of the house when the defendant called for him and did not have any gun in his hand until after the defendant had fired five shots and wounded the deceased.

On behalf of the defendant the evidence tended to show that the defendant and Frankum had been doing some work on this farm of the defendant for several days prior to this difficulty, without any opposition on the part of Bradley, the deceased, and that there was an unsettled account between them in regard to some wood and some potatoes. There was also evidence on the part of the defendant tending to show that Felix Noble was intoxicated the day before and on the morning of the shooting, and was so drunk that morning that defendant had to help him into the wagon and hold him down after he got him in, and that defendant took a drink with Noble just before leaving Game. The testimony on the part of the defendant also was to the effect that no threat was made by the defendant that morning, and that defendant's pistol was not on the shelf in the same room with the defendant when Summers was present, as Summers testified. There was also evidence of threats made by the deceased, some of which were of a vague and indefinite character. Defendant testified that he had never heard any of said threats until after the shooting, and did not know of any ill-feeling existing toward him on the part of the deceased; that their relations were friendly and he had often taken dinner with the deceased and family and had shot craps with him in the saloon for cigars and drinks. Defendant and Frankum testified that the ill-feeling of the deceased toward defendant had been brought about by the fact that defendant had sawed up into firewood, and hauled away, some logs which had been lying in the barn yard occupied by the deceased,

and defendant had removed from the barn a lot of partnership potatoes and hilled them up on the premises to keep them from freezing, and had taken for his own use a sack full of them.  The defendant's testimony further tended to prove that defendant fired but three shots; that these shots entered the body of the deceased from the rear and ranged upwards.

Frankum testified in detail that when they reached the premises of the deceased that morning he drove the wagon up close to the lot gate and stopped, the defendant Miles got out and found the lot gate locked and called to Bradley to come out and unlock the gate, whereupon the deceased replied: "You come and make me." Thereupon the defendant then told him to unlock the gate and Bradley went in and got his gun and said, "You make me." Bradley, the deceased, was standing on the porch holding his gun in his arms about half raised; the defendant then told him if that was the way he was going to do, to get his book and settle up.  The deceased then went in and got his book and came out to the gate.  When he came out with the book, the defendant went into the yard and witness saw them, they were fighting.  He did not know who struck the first lick, but heard defendant say: "You got your gun to shoot me with awhile ago," and deceased said, "G— d— you, I will kill you," and started to the house in a run; thereupon defendant shot him, fired three shots pretty fast.  The deceased was two or three steps from the defendant when the defendant began shooting; when defendant fired the last shot, the deceased was going up the steps of the porch.  The defendant ran after the shooting, and deceased got his gun, came out on the porch and fired one shot at defendant, who was twenty-five or thirty feet from him.  The deceased was gone a very short time after the gun, not long enough in the opinion of the witness to have taken the gun, loaded it and return to the porch and fire at the defendant.  Witness did not see where Bradley got the gun.

The defendant testifying in his own behalf corroborated Frankum's statement and adds that after the deceased had said, "You make me unlock the gate," he said to him, "If you are going to treat me that way get your book and we will settle up and quit one another." Thereupon the deceased went back and the defendant thought he had carried the gun into the house; that defendant went to the lot gate and saw the gun sitting by the side of the door in the hall. Deceased went into the house and got his book. "We then got into this settlement, he commenced cursing about the potatoes and told me I took too d— much authority, I told him I done so as an accommodation. He said I had been stealing the potatoes that he owned; that I was a d— thief, I told him he was a liar. He struck at me then and hit me on the arm and we commenced fighting. I said to him, 'You started to get your gun, didn't you?' and he said, 'G— d— you, I will get it,' and started to the house. I fired three shots as fast as I could shoot. He was either going up the steps on the porch or at the door of the porch when I fired the last shot. After that I ran, got out of the gate; I thought I had missed him; I ran sixty or seventy feet when he came out with his gun and shot, I thought twice, but others say he only shot once."

The points upon which the defendant seeks a reversal and the facts in connection therewith will be noted in the course of the opinion. But it may be added here that there was testimony in rebuttal on the part of the State contradicting the evidence for the defendant to the effect that Noble was drunk that day, and also contradicting certain statements attributed to the wife of the deceased.

I. It is insisted that William Kinley, one of the panel of forty from which the jury of twelve was selected to try this cause, was incompetent on the ground that he had formed and expressed an opinion. But it is apparent that the juror knew nothing about the case

except from neighborhood rumors; he had talked to no witness in the case, and knew nothing of the facts himself; he did state that from what Jim Ray told him he had some little sort of an opinion, if what Ray told him was true, but that Ray was not a witness and only undertook to tell him what he had heard. It was conceded that Ray was not a witness in the case and only undertook to repeat the rumors that he had heard, and the juror stated that he could render a verdict in accordance with the evidence. But it is unnecessary to discuss the competency of this juror further, for the reason that counsel for the defendant stated no grounds for the challenge of the juror further than for cause. [State v. Taylor, 134 Mo. 109; State v. Evans, 161 Mo. 95; State v. McGinnis, 158 Mo. 105; State v. McCarver, 194 Mo. l. c. 737.]

II. Error is assigned on cross-examination of Robert Barksdale, a witness for the defendant. This witness was called to contradict the evidence of Felix Noble, a witness for the State, after he had testified to the statements made to him by Noble as to the occurrence of the morning of the homicide. He was asked by counsel for the State where he had stayed the night before; to this counsel for the defendant objected for the reason that it was incompetent, immaterial and irrelevant. The witness then answered that he had stayed in jail the night before, and then on re-direct examination he testified that he had been put in jail for contempt of court for failing to appear when called the day before as a witness, and not for any kind of criminal offense. As the contempt for failing to obey the subpoena was in no sense a criminal offense, the proof that he had been in the jail for the contempt did not in the least tend to impeach his testimony. It was an examination upon an immaterial matter, and it certainly can not be said to have wrought any prejudice to the de-

fendant, though it should have been excluded as irrel-. evant.

Again, it is urged that there was error in permitting the State, after the close of all the other evidence, to offer in evidence the trunk in which the bullet holes appeared. While we think this evidence was clearly competent in chief, its admission by the court out of the usual order was in the discretion of the trial court. This has been so often decided that it is unnecessary to notice this point further.    [State v. Reed, 137 Mo. 134; State v. Thornhill, 177 Mo. 696.]

Another ground of complaint is that the court permitted the State to cross-examine Luther Frankum as to whether he was not a suitor of defendant's daughter. He testified he was not, and there was no contradiction of the evidence on this point, and no harm could have resulted from the testimony, but we see no objection to a cross-examination which seeks to elicit the relationship of the parties which has a tendency to show that his evidence might be more favorable on that account.

III.    Instruction numbered two, given by the court of its own motion, did not contain the words "feloniously" and "beyond a reasonable doubt," and because of the omission of these words, the learned counsel for the defendant insists that the instruction was erroneous, although in every other respect it properly defined murder in the second degree and correctly informed the jury what they should find in order to convict the defendant of murder in the second degree. It has been often ruled by this court that it was not error to omit the words "felonious" from the instruction defining murder in either degree.    In State v. Scott, 109 Mo. l. c. 232, it was said:    "The word 'felonious' is descriptive of the grade of the offense, rather than the criminal act which constitutes the offense, and ordinarily has no place in the instruction  .  .  .  and can be omitted altogether without affecting, in the least, the

correctness and sufficiency of the instruction." And it has also been ruled that, if used, it was wholly unnecessary to define it. [State v. Parker, 106 Mo. 223; State v. Cantlin, 118 Mo. l. c. 111; State v. Parker, 172 Mo. l. c. 205, 206.] It has just as often been held that it was no error to fail to use the words "beyond a reasonable doubt" in each of the instructions, but it is sufficient to give a general instruction on that subject applicable to the testimony as a whole. [State v. Good, 132 Mo. l. c. 126; State v. Pyscher, 179 Mo. l. c. 156.]

IV. Error is assigned on account of certain language used by the prosecuting attorney in his opening statement to the jury. The words attributed to the prosecuting attorney were these: "We shall show you that a more dastardly murder was never perpetrated on a noble and Christian soul." The record discloses that when the counsel for the State used this language it was promptly objected to by the defendant, and the court said that the language was improper, and said to the prosecuting attorney that he had already intimated to him that he should confine his remarks to what he expected to prove. Other remarks of the prosecuting attorney are alleged in the brief as hurtful and prejudicial, but by reference to the eighth assignment in the motion for new trial, it will be observed that the defendant singles out the one remark in the opening statement, which he considered an error, and makes no complaint of other remarks in the opening statement. If he desired these other remarks to be reviewed in this court, it was clearly the duty of the defendant to have called the trial court's attention thereto in his motion for new trial. In view of the fact that the trial court at once disapproved and rebuked the prosecuting attorney for referring to the deceased as a noble and Christian soul, we are of the opinion that it was no such error as to work a reversal of so important a cause. In State v. Sublett, 191 Mo. l. c. 174, it was said by this court: "While counsel in addressing the jury should confine

their remarks to the facts of the case under considera-
tion, as disclosed by the record and the evidence, a
judgment should not be reversed and a new trial
granted for every slight transgression by counsel of
the character alluded to; but to authorize such a course,
the court should be satisfied that the improper remarks
were prejudicial to the defendant and had some influ-
ence with the jury in arriving at their verdict, which
we do not think the case in this instance.''

V. It is urged that the circuit court erred in giv-
ing instruction numbered 16, in the following circum-
stances:

At the close of the opening argument for the State
Mr. C. B. Faris, one of the counsel for the defendant,
in his argument before the jury, said, among other
things, that as marshal of the town of Game, the de-
fendant had a right to have and carry concealed upon
his person, a pistol, and thereupon the court, during the
argument of Mr. Faris, after the above statement was
made, gave the jury this additional instruction: ''The
court instructs the jury that if you believe from the evi-
dence that the defendant John Miles was, at the time
of the alleged homicide, marshal of the town of Game,
that fact of itself would not authorize him, as such of-
ficer, to go around the country armed with a pistol.''
It is clear that the learned counsel for the defendant
was usurping the function of the court in stating the
law to the jury as to the right of the defendant to carry
concealed weapons, and it was evidently given by the
court to correct what it deemed to be a misstatement of
the law made by the learned counsel. It is plain that
the action of the court was induced by the statement of
the learned counsel. It is now suggested by counsel for
the defendant that, if he was transgressing the points
of legitimate argument, the correct practice would have
been for the court to have checked him and admonished
him to keep within the record, but if the court had un-
dertaken to do this verbally, we would in all probability

have had the objection made that the court was giving instructions not in writing.  Upon consideration of the whole matter, the testimony of the defendant as well as that on behalf of the State, it appears to us that the right of the defendant to carry a concealed weapon on the morning in question was not an issue in the case. He was confessedly not performing any duty devolving upon him as marshal of his town, nor had he gone to the premises of the deceased to execute any process or warrant, or to make any arrest, and all reference to his right to carry a concealed weapon on that occasion was foreign to any proper discussion of the cause, and while the learned circuit judge deemed it best to correct the statement of his counsel as to such a right by this instruction, it is perfectly obvious that it could not be said to be prejudicial to the defendant, and it affords no ground for reversing the judgment.

VI.   Again, it is made another ground of new trial that Mr. Rice Pierce, one of the counsel for the State, made improper and prejudicial remarks in the course of his argument.  It is said that he made the remark that defendant did not deny anything.   It appeared from the bill of exceptions that what Mr. Pierce did say was, "I am saying that he did not contradict.   If I am wrong, I will stop."   The Court:  "You may proceed." Mr. Pierce, continuing, "I say that witness went on the stand and said that this man was hitting Bradley with a pistol when he turned.   The defendant was a witness in the case, and what does he say?  He says: 'I said to him all that Frankum said he heard him say, and that was, "Now get your gun; go get your gun; go and get your gun."'"   Defendant, when on the stand testifying in his own behalf, said:  "I told him [the deceased] after he started, to get his gun."   The burden of this objection is that the State's attorney had no right, in discussing the testimony of the defendant and the defendant's witness Frankum, to say that there was no contradiction by the defendant of what his witness

Frankum had said, on the ground that our statute (sec. 2638, R. S. 1899) provides: "If the accused shall not avail himself or herself of his or her right to testify or of the testimony of the wife or husband, on the trial in the case, it shall not be construed to affect the innocence or guilt of the deceased, nor shall the same raise any presumption of guilt, nor be referred to by any attorney in the case, nor be considered by the court or jury before whom the trial takes place." This statute has been before this court on various occasions. In State v. Graves, 95 Mo. 510, it was held error to allow the prosecuting attorney over the objections of the defendant and without rebuke from the court, to comment upon what the defendant might have testified to, or did not, when on the witness stand. *Arguendo,* the court said: "Under this statute, the defendant has two options, the first of which is that he may elect either to go on the stand or not, as a witness; and second, when he elects to go on the stand, he may testify only to such matters as he may choose. It is clear that, under the statute, if he elects not to go on the stand, the fact that he did not testify at all, could 'neither be construed' to affect his innocence or guilt, nor be referred to by any attorney in the case. If the statute forbids comment upon what he might have sworn to when he elected not to go on the stand, why does it not in its essence and spirit, when he elects to testify, also forbid comment upon what he might have sworn to while on the stand and which he elected, as under the statute he had a right to do, not to testify about? In the case of State v. Anderson, 89 Mo. 330, it is said *in arguendo,* 'that under the statute no comment or allusion can be made to the failure of a defendant to testify in his own behalf, yet this rule extends no further than the terms of the statute, so that when a defendant in a criminal cause takes the stand, and fails, as in this case, to testify to and explain prominent and damaging facts peculiarly within his own knowledge, the inferences from such failure

are as adverse as though he was a witness in a civil case.'' Subsequent cases of this court have repeated the rule that it is improper for counsel for the State to comment on the defendant's failure to testify to any particular fact. [State v. Elmer, 115 Mo. 401; State v. Fairlamb, 121 Mo. 150; State v. Snyder, 182 Mo. 523, 524.]

But in State v. Ruck, 194 Mo. 440, 441, the facts were similar to those now before us. In this case, there was no failure on the part of the defendant to testify. In his testimony he undertook to tell all that was done and all that was said by himself and the deceased at the time and just before the homicide. The counsel for the State, in the remarks objected to, was simply stating that there was no contradiction by the defendant in his testimony of what the defendant's witness Frankum had testified to. In State v. Ruck, 194 Mo. 441, after discussing the difference between the case of State v. Snyder, 182 Mo. 523, in which the defendant failed to testify, and in which the witness detailed a transaction between himself and the defendant when no other person was present, and in which the prosecuting attorney in discussing this evidence said that he believed what the witness had said was the truth, *and it had not been denied,* and repeated that there was no witness on the defendant's side to deny it, it was held that this was an unlawful reference to the defendant's failure to testify and a violation of the statute. Whereas, in Ruck's case, counsel for the State in the course of his argument used the general language, ''Here we have testimony undenied and undisputed.'' And it was insisted that that was a reference to the failure of the defendant to testify, but it was said that where the evidence had taken a wide range and included many facts and circumstances, it was perfectly competent for counsel for the State, in his argument, to insist that the State had established these facts beyond contradiction, and it was said, ''Nor do we think it will do to give

section 2638, Revised Statutes 1899, such a construction that counsel for the State may not in the course of an argument, if the evidence of the State is uncontradicted, allude to it as undenied and undisputed.''

But the statements of Mr. Pierce in this case clearly violated no statute or rule or propriety; he was simply attempting to demonstrate, as well as we can glean from the meager excerpt from his speech, that taking the testimony of the defendant's witness ·Frankum, and the defendant himself, there was no contradiction really between them, and that defendant had assaulted Bradley with a pistol by beating him, and then when he started towards the house shot him. We · think there was no error in the action of the court on this point.

Neither was there any error in the statement of the assistant attorney for the State stating that the testimony showed that ''the defendant put his hand in his bosom and pulled out a naked weapon. The defendant did not deny it, there is no contradiction of that fact.'' In view of the fact that the defendant in his own behalf stated that he shot at the deceased three times as he ran from him, it would seem that counsel for the State might well say, as he did, that the defendant pulled out a naked weapon, and that there was no contradiction to that fact, as there was none. It was testified to by all the eye-witnesses, and the counsel for the defendant in the argument of the cause justified the defendant in carrying the pistol. The statement that the defendant did not deny it had not the remotest reference to any failure on the part of the defendant to testify. It was but his way of asserting what the defendant and all the other witnesses stated, that the defendant drew his pistol that morning, and shot at the deceased and inflicted wounds from which he died. If under the defendant's own statement in the case, counsel could not assert these facts and state that they were not denied, then there is no longer any right of argument left to the

State. As to the reference to the scabbard, when the counsel for the defendant objected to this, the circuit court properly said there was no evidence one way or the other on that subject, and at most it was but a deduction which counsel had a right to draw from the evidence or want of evidence. It did not effect the case one way or the other.

VII. Complaint is made that the prosecuting attorney in his closing argument alluded to the witness Felix Noble as a good man, and to the negro man, Rhodes, who testified to the number of drinks that Noble took and the exact number of minutes which elapsed between the drinks, as a black rascal, whose testimony should not control the judgment of the jury. Objections were made by the counsel for defendant to this statement, first, that there was no proof that Noble was a noble and good man, whereupon, the prosecuting attorney invoked the presumption that every man was a good man until you show otherwise, to which counsel for the defendant answered there was no proof of that fact in this case, and the court stated there was no proof either way, and counsel for the defendant excepted to the ruling. The mere fact that the prosecuting attorney alluded to old man Noble as a good man, is certainly no ground to reverse this judgment. Nothing is more common than that counsel will commend their own witnesses and depreciate those of the opposite side. As to the remark in regard to the evidence of the witness Rhodes, the witness had laid himself open to the severest criticism by the character of his testimony, and while the criticism might have been couched in more elegant language, it is out of the question to hold that this designation of the witness should reverse this cause. We are reminded in this connection of what was said by Judge SHERWOOD in State v. Emory, 79 Mo. 463, that: ''Prosecuting attorneys are now so 'cabin'd,' 'cribb'd,' 'confin'd,' that they are really afraid to make an effective speech; to indulge in just and fierce invec-

tive against a criminal, lest if a verdict be won for the State the judgment will be reversed.    Every term of this court changes are rung on on improper remarks made by the prosecuting attorney.    It is high time that this 'point, no point' should cease to be pressed upon our attention.''

VIII. It is next urged as a ground for reversal that the circuit court erred in refusing to accept the verdict of the jury, which was first returned into court finding the defendant guilty of manslaughter in the second degree and assessing his punishment at a term of thirty years, and directing the jury to retire for further consideration, after which they returned a verdict of murder in the second degree, assessing the punishment of the defendant at thirty years in the penitentiary. From the testimony taken on the motion for new trial it appeared that when the jury returned into court, they handed their verdict to the clerk, and it was in this form: ''We the jury find the defendant guilty of manslaughter in the second degree, and do assess his punishment by imprisonment in the penitentiary for a term of thirty years.''    At this point the judge said to the clerk, ''Hand me those instructions.''    Thereupon the judge informed the jury that their verdict did not conform to the instructions of the court; that under the law given them by the court, they could not assess the punishment for manslaughter for thirty years.    The foreman of the jury testified that at the close of the argument by counsel, the court handed the jury blank forms for their verdict with the instructions in the case.    He states that when the verdict for manslaughter was read over by the clerk, by the direction of the judge, several of the jury at least told the court that that was not their verdict, that there was a mistake. The court thereupon stated to the jury that it could not receive the verdict and directed them to retire and consider of their verdict. Afterwards, on the same day, the jury returned a verdict of guilty of murder in the sec-

ond degree and assessed the defendant's punishment at
thirty years in the penitentiary. It is clear from all the
testimony on the motion as well as from the statement
of the judge in the bill of exceptions, that the court did
not receive the verdict. It seems perfectly plain that
the verdict of manslaughter was not intended by the
jury, but was the result of having a form of a verdict
of manslaughter as well as one for murder in the sec-
ond degree furnished them by the court when they re-
tired, and that they had filled out the blanks in the man-
slaughter verdict instead of the one for murder in the
second degree by oversight of the foreman, and that
when their attention was called to it by the reading of
the verdict by the clerk, the jury never declared it was
their verdict in court. And the court advised them that
they could not affix a punishment of thirty years for
manslaughter and directed the sheriff to return the
jury to their room to consider further of their verdict.
And afterwards they returned into court the verdict of
murder in the second degree, which was read over to
them and they all declared, in the presence of the court,
that this was their verdict, and they were then discharg-
ed. Mr. Bishop in his New Criminal Procedure, vol. I,
sec. 1003, says: "Until the announcement that the ver-
dict is recorded, . . . or some such period, as to which
the cases are not distinct or uniform—the jury may
change it at pleasure, or one may defeat it by dissent;
but after they have dispersed, they cannot be recalled
to alter or amend it, nor can a juror object that he did
not consent thereto." And in section 1004 he says:
"A verdict inadequate in form or substance should not
be received; but the jury should be required to perfect
it, either in the presence of the court, or by returning
for the purpose to their room, due consultation having
been had with the judge, and if necessary further evi-
dence delivered." The authorities fully sustain the
text of the learned author.

In State ex rel. v. Clemenston, 69 Wis. 635, the court

says: "All the authorities hold that a jury may after announcing a verdict, if they see fit before they are discharged, change the same and render a different verdict. And in many cases, where the jury have manifestly made an omission or mistake in their verdict, it is the duty of the presiding judge to call their attention to that fact, and return it to the jury for correction." Many cases are cited by the court in support of this statement and the court concludes, "These cases show the power of the court as well as the jury over their verdict, and that the verdict which binds all parties, is that at which the jury finally arrive and deliver to the court."

In State v. Keasley, 50 La. Ann. l. c. 763, the Supreme Court of Louisiana said: "Counsel for the accused does not controvert the proposition that the court may decline to receive an illegal and imperfect verdict. He contends that the result was after the court had given its instructions regarding their power to make a change, the jury instead of making a change resumed its deliberations and changed a finding previously announced. That the first verdict showed that the jury had concluded that though defendant had shot at Antoine he had missed him. That this finding was changed in consequence of the second instruction regarding their first finding. The following from Bishop's Criminal Procedure directly applies: 'When the jury comes in with a verdict it is not as of course to be immediately received in the form in which it is rendered. And it is probably the correct doctrine that the judge may require the jury to pass on the verdict upon the whole indictment in such form of words as shall constitute a sufficient finding in point of law, or if they refuse, decline altogether to accept the verdict. It seems quite plain that in every case of a verdict rendered the judge or prosecuting officer or both should look after its form and its substance so as to prevent a doubtful or insufficient finding from passing into the record of the court.'

[Vol. 1, sec. 1004.] . . . . It is settled by repeated decisions, where the jury returns an incomplete verdict, or one not responsive to any charge in the indictment, the court may direct them to retire and bring in a proper verdict. It follows that the court may inform the jury, without necessarily suggesting what shall be the verdict, why it is that the verdict is incomplete, or not responsive to the charge."

In People v. Jenkins, 56 Cal. l. c. 7, it is said: "It is the duty of the lower court to look after the form and substance of a verdict, so as to prevent a doubtful or insufficient finding from passing into the records of the court; for that purpose the court can, at any time while the jury are before it, and under its control, see that it is amended in form so as to meet the requirements of the law."

In Heller v. State, 23 Ohio St. l. c. 584, it was said: "Where, on the trial of an indictment for malicious shooting with intent to kill, the jury return for their verdict that they 'find the defendant guilty of shooting with intent to kill, while in a fit of passion and excitement, but without malice,' it is not error for the court to refuse to receive such verdict and require the jury to further consider the case."

In Trent et al. v. State, 31 Tex. Cr. Rep. 251, the jury returned a verdict finding both guilty, and affixing the punishment at confinement in the reformatory, whereupon they were informed that Trent could not be sent to the reformatory, and thereupon they retired and returned a verdict sending both to the penitentiary. And it was held no error.

In State v. Taylor, 14 Tex. App. l. c. 351, 352, it was said: "We think the action of the court in refusing to receive the first verdict returned by the jury, was correct. This verdict found the defendant guilty of murder in the first degree and assessed the punishment at confinement in the penitentiary for ninety-nine years. It was not only an informal verdict as to the punishment,

but it was contrary to the charge of the court, and it was not such a finding as the court could receive. It was not only proper but it was the court's duty to refuse to receive the verdict and to call the attention of the jury to the charge of the court and send them out again to consider of their verdict."

In State v. DeWitt, 186 Mo. l. c. 71, it was said by this court: "A practice has obtained in many of the circuits, which we commend, of the courts giving the jury a form for their verdict, but when the verdict is returned, and it is found uncertain or insufficient, the court should so state to the jury and require them to put it into proper form, or with their consent amend it in their presence."

That the finding of the jury in the first verdict, that the defendant should be imprisoned in the penitentiary for thirty years for manslaughter, was contrary to the law and the instructions of the court, there can be no doubt, and it was clearly in the power of the court, and it was his duty to decline to receive the verdict in that form, independent of the fact that the jury had made a mistake in filling out the blank verdict for manslaughter instead of the one for murder in the second degree, and when the jury discovered their mistake, it is also obvious that it was in the power of the jury to correct it when they retired to further consider their verdict.

But we are cited by the learned counsel to section 2651, Revised Statutes 1899, which provides: "If the jury assesses a punishment, whether of imprisonment or fine, greater than the highest limit declared by law for the offense of which they convicted the defendant, the court shall disregard the excess, and pronounce sentence and render judgment according to the highest limit prescribed by law in the particular case." But that section evidently refers to a case in which the court receives the verdict and then prescribes the sentence which shall be inflicted. It does not compel the court to

receive a verdict which is illegal on its face, nor require
the court to receive a verdict which the jury, when their
attention is called to it, state is not their verdict, but
is a mistake, as is the case here. After a consideration
of all the authorities on this subject, we are satisfied
that no error was committed by the learned circuit
court in declining to receive the verdict, and in calling
the jurors' attention to the mistake that had been made,
nor in permitting the jury to retire to their room and
further consider the matter, and in finally receiving
their verdict finding the defendant guilty of murder in
the second degree and assessing his punishment at thir-
ty years in the penitentiary.

But there is another reason why the objection now
urged to the action of the court in calling the attention
of the jury to the error in their verdict, and in permit-
ting them to retire to their room and correct the same,
cannot avail the defendant on this appeal and it is this:
when the court declined to receive the verdict and di-
rected the jury to retire to consider further, no objec-
tion or exception to the court's action was taken by the
defendant at the time. Nothing is better settled in this
State than that exceptions in criminal causes rest upon
the same footing and must be taken in the same way as
provided by law in civil cases, and cannot be urged for
the first time in a motion for new trial. [State v. De-
Mosse, 98 Mo. l. c. 343, and cases there cited.]

IX. It is further objected that the court erred in
giving oral instructions to the jury. To the understand-
ing of this point, it should be stated that after the jury
had retired to consider their verdict, they requested to
be brought before the court, and thereupon the foreman
or some other member of the jury stated to the court
that some of the jurors did not understand the instruc-
tions, and thereupon the court stated to the jury when
the instructions provide a minimum punishment, the
jury cannot go below that minimum, but where the in-
structions provide no maximum punishment, the jury

are at liberty to fix the punishment for such length of time as they see fit, not less than the minimum. And the jurors not having requested any further instructions, the court directed them to be returned to their jury room. The defendant and his counsel were both present when the jury made their statement to the court and when the court directed them as to the meaning of the instruction, and the bill of exceptions discloses that no objections were made and no exceptions taken to the action of the circuit court in explaining to the jury the meaning of the instructions as to the extent of the punishment. As already stated, for that reason the point now made is not open for review by this court. [State v. DeMosse, 98 Mo. 343, and cases cited.]

X. Counsel for defendant complained that the prosecuting attorney asked the witnesses questions as to the good reputation of certain of the State's witnesses when such reputations had not been attacked by the defendant, but admits that when such questions were asked counsel for the defendant objected to the same and their objections were sustained by the court. It is too plain for discussion that the circuit court cannot be convicted of error under such circumstances. [State v. Grant, 144 Mo. l. c. 65.]

XI. Finally, it is insisted that the punishment is so excessive as to indicate bias and prejudice on the part of the jury. We are unable to concur with the learned counsel in this contention. If the jury believed the testimony for the State, as they evidently did, the defendant began the difficulty by striking the deceased over the head with his pistol when the deceased was unarmed and then when the deceased ran from him, shot him three times. The testimony was sufficient to justify the jury in finding that the defendant went to the premises of the deceased armed with a deadly weapon, and without any

lawful provocation assaulted the deceased by beating him over the head with a revolver and then brutally shooting him down in his own yard, in the presence of his family. The jury evidently repudiated the plea of self-defense, as they well might have done, and we see nothing in the evidence that indicates that the verdict was the result of passion or prejudice on the part of the jury, and this last assignment of error must be ruled against the defendant.

After a careful consideration of the whole record, we are of the opinion that the defendant had a fair and impartial trial, and the judgment of the circuit court should be and is affirmed.

*Burgess, P. J.,* and *Fox, J.,* concur.